Well, thank you and we welcome everybody. Judge Horniman and I are very pleased today to be sitting with Judge Aldisert, who is here in spirit and by video conference. Judge, do you hear us? I can hear you, but they promised that this would be repaired by September because I haven't been able to see any of my colleagues except at conference, so I missed the opportunity of seeing you during the oral argument, but I'm always happy to. And likewise, you should know that you're not on our little monitor, so neither Judge Horniman nor I can currently see you. Okay. Well, I think it's significant that although I live in Santa Barbara, I consider myself a Pittsburgher, and this is an all-Pittsburgh panel today. Indeed, and a couple cases from Pittsburgh, it made me wonder whether or not we shouldn't have heard them in the western part of the state, however. But with that, we will call the first case, and the first case is Televandos v. Vacation Charters, Ltd., Ms. Walsh. Good afternoon. May it please the Court, my name is Donna Walsh and I represent the appellant, Vacation Charters, Ltd. May I reserve three minutes rebuttal time? That request will be granted. Thank you. The district court in this case erred in not entering judgment as a matter of law in favor of Vacation Charters, on a record that was lacking the sufficient evidentiary basis for any of Mr. Televandos' four claims. His first claim was a claim for intentional infliction of emotional distress, under Pennsylvania law announced in Kasatsky. The Supreme Court's decision in that case makes clear that even though the court had not yet recognized a formal claim for intentional infliction of emotional distress, at a minimum, if that claim were to be recognized in Pennsylvania, competent medical evidence is required to make out a claim. There was no competent medical evidence, or any medical evidence in this case. Was that part of the ruling dicta? I don't believe so. I believe the ruling in that case was based on the plaintiff's unsupported affirmance that they suffered emotional distress. And the Pennsylvania Supreme Court in that case made clear in its holding that at a minimum, medical evidence was required. And based on that, entered a compulsory non-suit, or excuse me, affirmed the entry of a compulsory non-suit in favor of the defendant in Kasatsky. And this court recognized this same holding in Williams. The court held the same in Williams that medical evidence is an absolute prerequisite to bringing such a claim. And there was no medical evidence in this case. Nor was the conduct of which Mr. Televandos complains extreme and outrageous. The case law announced by this court in Cox and other cases... Would you speak a little louder, please? I'm having difficulty. I'm sorry. Thank you. As I was saying, the conduct in this case is not sufficiently severe and outrageous to make out a claim of emotional distress. This court announced in Cox that it's extremely rare to find that conduct in the employment setting. And there is no conduct in this case that takes it out of the realm of normal things that occur in the workplace. Mr. Televandos complains that he did not get a promotion, that he got warning notices that he did not agree with, and that he was eventually terminated. This court in Cox and in other cases has held that that kind of conduct in the workplace is not sufficiently severe and outrageous to make out a claim for emotional distress. And we contend, based on the lack of those two factors, the first being medical evidence and the second being evidence of extreme and outrageous conduct, there was not sufficient evidence to support the jury's verdict in favor of the plaintiff on the claim for intentional infliction of emotional distress. And because the award was a combined award, this court in Andrews held that because it was a combined award, because it's impossible to discern what the jury would have done had they not had the faulty intentional infliction claim before them, we must remand the case for a new trial on damages. And had that been the only error, that would be the remedy I'd be seeking today. But there were other errors that occurred at the trial court level we contend. And that is with respect to the other three claims asserted by Mr. Televandos. Now, before you go to that, the appellee, Mr. Televandos' counsel, would argue that the jury instructions given to the jury didn't specifically direct the consideration of compensatory damages on the intentional infliction of mental distress claim. If that is the case, and it looks to me like that was the case, wouldn't that, even if we agreed with you on the expert testimony issue, wouldn't that obviate the need to return this case to the jury on the damages issue? I don't believe so. The error was in submitting that faulty claim to the jury. And what the jurors were asked in question number, I believe it was question number 7 on the verdict form, they were asked whether, I apologize, it was question number 11, they were asked to submit a general finding of damages on behalf of not just the intentional infliction claim, but the intentional discrimination claims as well. So it's impossible, based on that verdict form, to discern what they would have done had the faulty claim not been submitted to them. And it's important to note that there was a proper, timely objection to the submission of that claim to the jury. It was objected to both at the conclusion of the plaintiff's case and then again prior to submission of the entire case to the jury. And the trial court allowed exceptions in this case to counsel for all of the jury instructions in the case. And we contend that the error was not in the way the instructions were framed, but in the submission of the intentional infliction count to the jury. And that was properly and timely objected to. And based on this court's reasoning in Andrews, it's impossible for us to look back at that combined verdict and parse out what the jury would have done had not that improper claim been submitted. So we contend that, no, it's not a harmless error. It would be impossible to just strike out that finding and allow the verdict to stand. With regard to Mr. Talibandos' other claims, he contends that he was the subject of retaliation in response to two separate incidents that occurred at work. He contends that he was retaliated against when he was let go after he submitted a complaint of harassment. His complaint consists of four sentences. He says simply, I want to raise a very serious issue. I am facing what I think is harassment. He doesn't mention any of the prohibited grounds in Title VII. And as this court's jurisprudence in Slagle and Barber made clear, he needs to do more than that if he wants to make out a claim for retaliation under Title VII. In order to engage in protected conduct, he needs to link what he's complaining about to one of the prohibited grounds in Title VII. And he did not do that in his letter that he submitted on February 20, 2003, which appears in A725 of the record. But doesn't he have to look at more than the letter? I mean, doesn't he have to look at the other complaints that he voiced to Mr. Hruska and others about the discrimination? I believe if there were more in the record, it would be appropriate and necessary to look at those other things. But that's all we've got in this record. The only instance in which Mr. Talibandos expressed any dissatisfaction to management about the way in which he was being treated was contained in that letter. He doesn't mention his national origin. He doesn't mention the place of his birth. He doesn't mention his race. He doesn't mention any of those things. And that's why we contend that that letter, which is all we have to look at in this record, that letter is insufficient to qualify as protected conduct under the Third Circuit's rulings in Barber and Slagle. Now, we don't end there, though. We can just ask or consider what Mr. Talibandos himself said. He was asked by his own counsel at trial, why do you think you were fired? He didn't mention his letter. He didn't mention harassment. He didn't mention the way he was being treated. He didn't mention his national origin. He didn't mention his race. He didn't mention his place of birth. When he was asked at page A-142 of the record, what do you think the reason was why you were terminated? He mentioned his origin, but the claim in this case was that he was terminated because of retaliation. He does not have a claim that he was terminated because of his national origin. His claim is he was terminated for retaliation. And when he was asked at page A-142 of the record, why do you think you were let go? He never mentioned his letter. He never mentioned retaliation. He never mentioned anything else that could be considered protected conduct. Don't you have a problem with temporal proximity, though? We have affirmed summary judgment in a variety of cases where the adverse employment action occurred in a time that's quite remote from the activity complained of. And here it seems to me you have the inverse of that situation. You have a real problem with two days, if I remember correctly. Right. He received a series of warning notices in January of 2003, and he was suspended on February 19th of 2003. And he came into work on February 20th with this notice claiming he was the victim of harassment. And you're right, he was let go several days later. Several or just two? I believe he was formally told two days later that he was being let go. And, yes, if that were the only issue that we had to look at, temporal proximity would be a problem. But more importantly, we don't have any protected conduct here. The only basis, again, to challenge the termination decision is retaliation. He's not claiming that he was the victim of discrimination on the basis of his national origin with regard to the termination. He's just claiming retaliation. And we don't have protected conduct because the letter does not mention any of the prohibited categories in Title VII. And under Barber, under Slagle, he needs to do more than that to make out a claim for retaliation. Slagle was clear. This court, Slagle said, we cannot dispense with the requirement that the plaintiff allege prohibited grounds. He didn't do that in his letter. So had we just been dealing with this issue of temporal proximity, it would be a problem. But because there's no protected conduct, I contend that ours is not. Now, with regard to Mr. Telemannos' earlier claim, he contends that he was passed over for a commotion in the summer of 2003 because he complained about retaliation director of the – I'm sorry, he complained about discrimination directed at his friend, Mr. Sala. And that complaint consists of a two-page letter which we've produced in our brief and which appears at A815. And again, nowhere in that letter does he say, I think my friend is being treated unfairly or differently because of his race, because of his national origin, because of his background. And under this court's rulings – Ms. Walsh, this is Judge Alderson. I'm sorry to interrupt you. I had difficulty catching all of your arguments. I take it that what you want us to do is to actually reverse, not remand, so that as far as you are concerned, you believe that there is nothing left to be done here. Is that your argument? That's correct, Judge. I hope you can hear me. Just so I follow you. First, we have the state court on claim of intentional infliction. That was separate and apart from the Title VII. Is that right? That's correct. All right. So that went to the jury on the state court, state court claim. Is that right? That's right. And you are arguing that there is – there was no evidence of ethnic discrimination to make a Title VII case as to the plaintiff. That's correct. He contends that he was cast – All right. Okay. All right. I'm just trying to find – On the retaliation, are you arguing that the termination of Chef Sid was not on the basis of any of the protective statutes? Is that right? And that, therefore, there should not be a claim of retaliation under Title VII. Is that your argument? I believe that Chef Sid was let go after my client was – or after, I'm sorry, after Mr. Televandos was let go. Well, we have a situation where he is claiming Title VII damages on the basis of retaliation for his defending the treatment of Chef Sid. Is that right? That's right. Okay. And are you arguing that the termination of Chef Sid was on his function and not on the basis of ancestral discrimination? Yes. Chef Sid was terminated because he did not return to his position on a timely basis following a six-week vacation in Egypt. When your friend comes in to argue in a few minutes, what will be the strongest case against you that the chef was terminated because of his religious or ancestral origin? I'm not sure what is the strongest case that my opponent will present because the issue of discrimination – Well, what did the district court do? What did the district court do on that issue? The district court allowed that to go to the jury, right? Well, the issue was whether the complaint that my – or that Mr. Televandos submitted in connection with Chef Sid, and that's the one-page handwritten letter that appears at page 8815. The issue was whether that letter that Mr. Televandos wrote complaining of the way in which Chef Sid was treated on one occasion when Mr. Hruska came into the kitchen and berated him, called him a child, berated him for currying favor with the boss. That was the one communication from Mr. Televandos to management complaining of how Chef Sid was treated. Our contention is that there's nothing in – I apologize. Okay. Well, wasn't there some evidence of the chef being called a camel jockey or something like that? There was a contention by Chef Sid, not the faculty in this case. I know. I'm sorry. I didn't make myself clear. I'm not talking about the plaintiff's Title VII case. I'm talking about the retaliation aspect, that he was penalized because he supported the chef who was fired. His support consisted of the letter that I mentioned, which makes no mention of the chef's national origin. And I contend that on the basis of barber, he needs to do more than that to constitute protected conduct. Thank you very much. Thank you. You've answered my question. Do you have anything else that you wanted to comment on just briefly? We'll give you another minute. Just briefly to wrap up, we contend that the two instances in which Mr. Televandos claims he was the victim of retaliation, in neither case has he established protected conduct, as this court has defined the parameters of what constitutes protected conduct. In addition to that, Mr. Televandos does have a claim that he was passed over for a promotion to the position of executive chef. That's the position that Chef Sid vacated. He contends that he was passed over for a promotion to that position because of his national origin. But again, looking at his own testimony, he was asked by his counsel at trial, why do you think you were passed over? He made no mention of his national origin. And we contend, based on this record, there is insufficient evidence to support the jury's verdict. On rebuttal, I'd like to hear from you on the attorney's fee issue, but we'll call Ms. Gelb at this time. Thank you. Ms. Gelb? Good afternoon, Your Honors. My name is Johanna Gelb, and I am here on behalf of the appellee, Alcas Televandos. With all due respect to my opponent's argument, I think this case kind of begins and ends where this court started it, which is with the jury instructions and the charge to the jury. Even assuming, as I stated in my brief, that the district court erred by submitting the intentional infliction claim, this was always a Title VII case. And by the way, I'm not waiving any – that should not be deemed a waiver of my position, that I don't think the court erred when it submitted the intentional infliction of emotional distress claim because I think the law is cloudy. Excuse me. Excuse me, Ms. Gelb. Are you saying that there wasn't a state tort claim of intentional infliction of emotional distress separate and apart from the Title VII? Are you saying that wasn't? No, I am not saying that, Your Honor. There was a fraud claim. Well, I just misunderstood. Is it fair then that what we have here were actually three actions, the state court claim of intentional infliction of emotional distress, the Title VII retaliation claim, and the Title VII discrimination claim. Those are the three. Am I putting that correctly? You are not, Your Honor. If I may, there were four claims that were presented to the jury here. One was that Mr. Talavandos was not promoted to the position of executive chef in July 2002 because of his national origin. And with respect to that claim, under McDonnell Douglas, we believe that there was the quantum of evidence necessary to submit to the jury and to support the jury's finding in support of Mr. Talavandos. How about the pretext? The second claim, Your Honor, if I may, that was presented to the jury that in addition to Mr. Talavandos not being promoted because of his national origin, he also was not promoted in retaliation for opposing a practice made unlawful, and that is that he was supporting Chef Sid's claims. And it was clear that Chef Sid had a claim based on his national origin, that being he was a Muslim Egyptian. And there was a lot of testimony in the record that Mr. Dickinson, who was the lodge manager in charge of the entire facility, knew that Chef Sid had been called a camel jockey. He knew it was a derogatory term for someone of Middle Eastern descent. He thought it was so derogatory that he held meetings at which he discussed the need for tolerance. This all took place in an atmosphere after September 11, 2001. And it was clear to the personnel, Mr. Hruska, who was the lodge manager, and Mr. Dickinson, who was in charge of the entire resort, that Chef Sid had a claim of discrimination. And it was clear, per the testimony, and I cited it in my brief, Your Honors, that they knew the management of Vacation Charters, that Mr. Televantos was supporting Chef Sid's position. And that is the protected conduct that occurred in July of 2002. We have Chef Sid submitting letters saying that he cannot take it anymore with Mr. Hruska, that he is being harassed and discriminated against. He asked Mr. Televantos to submit a letter. Mr. Televantos did so. Chef Sid, rather than being fired then at that point, was transferred to a sister facility also owned by Vacation Charters. And it is at that point that the head chef position opened up at the Split Rock. Mr. Televantos submitted that he was not picked for that position, though he was next in line because he supported Chef Sid's claim to discrimination. And, in fact, the record shows that Mr. Hruska testified at trial, that it was in his mind this position that Televantos and Mr. Sawa had together. And, in fact, Mr. Dickinson... I'm trying to follow your argument. I suggest that there were three counts and you said that there were four. What's the fourth one? The fourth claim is that Mr. Televantos was terminated in February 2003 for his own claim of discrimination submitted February 20th. Well, I can say... I thought we had a state claim. We had the discrimination claim on the part of the plaintiff, the retaliation claim on the part of supporting Chief Sid. What is the fourth one? His own claim for being fired in February 2003 for making his own complaint. He submitted a letter saying, I have been the victim of harassment. The testimony at trial was that. They were aware he had these claims. He got these write-ups on the day he was terminated. Temporal proximity is sufficient here to support the jury's finding that, in fact, Mr. Televantos was terminated by virtue of his own complaints. Ms. Gelb, on the intentional infliction of emotional distress claim... Yes, Your Honor. Why was the conduct which was presented extreme or outrageous? It was extreme or outrageous based on the fact that he made his claim and that he stood up and tried to protect somebody who was also a victim of discrimination. Your Honor, I will grant that the intentional infliction claim was not the strongest claim here. Because you didn't have any medical evidence. We did not have medical evidence. And that's required. Isn't that fatal to that claim? It seems to me that claim has to be reversed, does it not? I don't think so, Your Honor. I don't think so. Even if it's fatal, which I don't agree with, because there was testimony by Mr. Televantos that he had ulcers and he had medical problems, and that was not objected to at trial. But it's not the kind of expert medical evidence that the precedents require. It's not. It's definitely not medical evidence, Your Honor. We did not have an expert. We had all lay witnesses at the time of the trial. But I think that my client's testimony was sufficient. But I don't even think that's necessary. You say that, but what about Kazatsky v. King, David Memorial? Didn't the Pennsylvania Supreme Court make it very clear? You could argue whether it was dicta or not, but we're trying to predict what the Pennsylvania Supreme Court would say on an issue that they haven't really acknowledged yet as a valid claim. But they said something, and what they said was you had to have expert medical testimony. Regardless of what your client said, that couldn't have been expert medical testimony. But, Your Honor, I don't see that as being the issue, because even if this court were to find that that claim should not have been presented to the jury. Okay, let's assume that's the case. Let's assume that's the case. That has no bearing, and that should not result in a remand of this case, because we can't just stand here today and say, oh, the award was combined, okay? But we didn't object to it. But wasn't the award combined? The award was combined because there was no objection. I had no reason, Your Honor, to ask for a separate line. I know. And the defense counsel at the time of the trial. You say there was no objection. Ms. Walsh said there was an objection. Ms. Walsh said there was a Rule 50 objection, but this court has said in the Simmons v. Philadelphia case that, and I quote, these concerns are not abated by the fact that a party made earlier in support of a Rule 50A motion for a directive verdict have raised the point of law in which the party later alleges the jury instructions were deficient. Absent a timely objection to jury instructions that, again, raises a point of law, the court may very well fail to cover the point through inadvertence or based on the conclusion that the party had already abandoned its position. Was there an objection to the special interrogatory? There was not. And, Your Honor, that is covered by this court's recent decision in the Marra case, which was just decided March 6th of 2007. And then the Philadelphia Housing Authority had not obviously the same issue here, but an issue regarding a jury instruction that went on a PHRA claim and a Section 1983 claim. And the cite on that, Your Honors, is 497F3R286. And I think that, again, assuming that that state claim should not have gone, if we read Judge Conaboy's charge and we read what he told the jury to do with respect to compensatory damages, nominal damages, and lost wages, he told them that if they found there were violations of Mr. Talamando's federal claims. He never mentioned the state claim. And the jury did exactly what... But what concerns me is even though he didn't mention the state claim in his instructions, the special interrogatory is clearly question 11. It says if you find yes to questions 4, 6, 8, or 10. And 10 is clearly the emotional distress claim. Right, but then... Go ahead. I'm sorry. If you answered yes to this question, enter the amount of the compensation to be awarded. I don't see how you can get away from the fact that the jury was to clump together their affirmative answers on those four claims and come up with a sum. Your Honor, I'm not getting away from that. I don't think it was my obligation to make that objection. It was defendant's obligation to object to that to preserve the record. I think the law on that is clear. I think they've waived their right to do so by virtue of that. And now they come to this court and say, look, we wanted to keep a one-line item. We didn't want four separate lines. It was a plaintiff who would have gotten more money. But now we're going to, on the flip side, say, okay, now that we're on the appeal process, we should have had four lines, even though that's exactly what they didn't want. They had that obligation, Your Honor. Did they say anywhere on the record that they didn't want four lines? That's actually not there in the record. I didn't see that in the record, Your Honor. You cite that in your brief also, I think. But I don't see that where that argument you make, I don't see that anywhere. That's conjecture. Well, and it's equally conjecture, Your Honor, that the jury would have awarded less. That's pure conjecture. Vacation Charter stands here and says in their brief, hey, it's conjecture what the jury awarded for the one-state claim versus the three federal claims. But it's equally, you know, that's conjecture in and of itself. Is it really, though? No, because, well, two things. First, we're lumping together damages generally. It seems to me there's an important distinction between your lost wages award and your compensatory award. The lost wages award of $46,000, I don't know how that could be tied in any way to the state tort claim. On the other hand, the jury having found liability on the state tort claim, you're asking us to assume that the $100,000 that you won on compensatory damages was entirely allocable to the federal claim and 0% of it allocable to the state tort claim. And that just seems to me to be asking us to assume something that's the most irrational of the choices. I mean, there are various assumptions. We're trying to read the tea leaves here of what motivated the jury to award you $100,000 in compensatory. But it appears to me that we have to conclude, having found liability on a federal claim and a state tort claim, that it included both of those. I don't think the jury did anything irrational here. And I don't think I or Mr. Televandos is asking you to do anything irrational by denying the appellant's appeal here. I'm not saying the jury was irrational. I'm saying that the jury could not have foreseen that there was perhaps a technical defect regarding the lack of medical evidence such that the intentional infliction claim would be reversed by this court. And if that's, in fact, where we're going with this, don't you need a new trial on damages? And I have an additional question on that, which would be, if we do go that way, I have no idea whether we would, but if we did, could you conceivably get more than $100,000 in compensatory? You'd have a new damages trial, a new jury, and it's the plaintiff's counsel's dream to stand up in front of a jury and start right off by saying, my adversary discriminated against my client. Now let's just talk about how much money we're going to get here. Well, certainly it wouldn't be a dream, but it's not a dream I want to realize all too soon, unless that's what this court does, Your Honors. Don't pinch me yet. But interestingly, I cited the Hurley case in my brief because, again, the question ultimately then is, even assuming that the claim should have gone to the jury and assuming that you can't parse it out, which I think from a fair review of the court's instructions, it is parse-able. And I think if there's a parse issue, I think it's the obligation of vacation charters to object. And I don't think they can take advantage of the fact that they like the verdict slipped on the district court level, and now they don't like the verdict slipped because they did not prevail. But the question then under Rule 61 is whether or not that error is harmless. And in Hurley, the district court gave a quid pro quo jury instruction when there could no longer even be a quid pro claim. And the court there went through an analysis, which I will not repeat here in light of my time here, and ultimately said that even though there could not possibly conceivably have been a quid pro quo claim, because that had been banished, I guess, for lack of a better word, under Farringer, you know, they upheld the jury's verdict. And I think that this court can do that, too. I don't think that this court can. I agree with you, Judge Harmon, that the economic claim is not at all related. You couldn't get economic damages from an intentional infliction claim anyway. So that claim has to stand. And if the court ultimately says, you know, the jury's verdict on the three claims stands, and Mr. Televantos has to go back and argue for damages on three federal claims that he's already won, then, you know, I can't say that I'm, you know, that's my optimum result. But certainly Mr. Televantos would be, you know, happier with that. And I know I'm out of time, but I haven't had a chance to address the attorney's fees. Go ahead. Go ahead and address that. I think the, I anticipate that my opponent is going to come up here and say, well, you know, we did what Judge Canaboy told us to do in his November 14th 06 order, you know, file a petition for a stay or oppose the fee motion that I made, that I made in a timely manner in accordance with the rules, et cetera. They didn't either. They really didn't either. They didn't ask Judge Canaboy for an extension under Rule 6B. They didn't file a petition for a stay. That's why I attached the actual brief as a supplemental appendix, because they keep referring to it as a petition for a stay of proceedings. But what they filed is a petition for stay of execution. And Mr. Televantos never attempted to execute on the judgment at all. So I don't see how, you know, they, and I think as with the first appeal, I think they waived their right to object by not participating in the underlying proceeding. And they want to come here now and do that. So I think that their appeal on both issues, the fees and the underlying trial verdict should be dismissed. Well, let's assume if this went back, you're going to want to go in and ask for additional attorney's fees, are you not? If this goes back, sure, since October 4, 2006, absolutely. If it went back on the intentional infliction of emotional distress claim only, let's assume that, just a hypothetical. If it went back only on that claim, you're going to want to get additional attorney's fees. Yes, but that doesn't mean I think that I should have to defend the fees I already submitted because they failed to impose them. So that would be your position. Well, sure. I mean, I did what I was supposed to do, and they did not. Now they want a second bite at the apple, and they failed to object at all. I mean, their objection comes in a footnote. I understand. We understand your position. Thank you very much, Your Honor. Thank you, Ms. Gill. Ms. Walsh. Judge, I'll begin where you had asked earlier and where Attorney Gable had asked. Tell us why you should be able to come in front of us and ask for the right to file an answer when you didn't file any answer, in fact, didn't even file the appropriate stay in the district court. Well, I was not counsel at the district court level, but I understand from looking at the record that there was some confusion as to what is the effect of the filing of a notice of appeal. The judge in his, or Judge Carnegoy in his, The appeal had already been filed, correct? Correct. And in his November 14th order, Judge Carnegoy indicated that, although the appeal had already been filed, this court still has jurisdiction to decide the attorney's fees question. And it was in that November 14th order that Judge Carnegoy granted vacation charters the option of either filing a brief in opposition or filing a motion to stay action on the attorney's fee motion by November 22nd. And vacation charters did that. They asked the court for a stay, and the court considered that motion and denied it on the same day that the court granted the petition for attorney's fees. And we contend that that was error in violation of Rule 54. All right, but what did they do? Did they ask then for the right to file an answer? They didn't have the option to ask then for the right to file an answer because it was on the date in March of 2006 that the district court simultaneously denied the motion for stay and granted the motion for fees. We contend that the district court should have, if it was inclined to deny the motion, But there was no objection made on the record to the granting of the fees in absence of your client's filing an answer, was there? There was no answer filed earlier, and there was no opposition filed to the fee petition because vacation charters had accepted the court's offer of seeking a stay instead. So you think it's your argument, it's the simultaneous nature of the order entered on the attorney's fees that precluded the filing of an answer after the stay was denied. Correct. We should have been granted the option to file an opposition. On the issue of the proper remedy with regard to the intentional affliction count, if this court were inclined to remand the case for an additional trial on the issue of damages, well, first I contend that there would be no basis to open the attorney's fee issue because there's no basis to ask for attorney's fees on that state law claim. But I suggest that the court should do more based on this record because there is no protected conduct that makes out any of the Title VII claims. Because there is no basis for Mr. Telemandos' claim of retaliation. You've made those arguments, I think, already, Counsel. Let me ask you further on the remedy. Wouldn't you concede that, assume for a minute we send the case back for damages trial because of this inability to unpack the $100,000 award, wouldn't you agree that the $46,000 award is unaffected by that ruling? If the court were to not accept my arguments on the other counts, yes. The only issue would be a new trial of damages with regard to the compensatory portion of it. All right. And is there any parameters on the compensatory? I believe I'm not aware of any. The Third Circuit and Andrews faced this very same issue. In the Andrews case, there was a Section 1983 claim and an emotional distress claim. The emotional distress claim fell, and the court said, because it's a combined verdict, we have no choice but to send it back. And I contend that that's the proper remedy here if all we're talking about is the emotional distress. But if we do send it back, conceivably the new jury could award something less than $100,000 or something greater than $100,000. That's right. It would be a new trial on damages only. Okay. But, again, we contend for the reasons set forth in our brief that the evidence offered in support of the other claims are also deficient. And for that reason, we ask that the court remand with instruction to enter judgment in favor of vacation charges on all claims. Judge Ellis, sir, do you have any additional questions? No, thank you, sir. Okay. Well, we thank you, Ms. Walsh. Thank you, Ms. Gelb. Both counsel did an excellent job, and we'll take the matter under advisement. Thank you very much. Have a great afternoon.